UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    Plaintiff,

vs.

CASE NO. 6:23-cr-107-WWB-EJK

BRANDON EUGENE BROOKE,

    Defendant.
_____/

## SENTENCING MEMORANDUM

Defendant, Brandon Eugene Brooke, by the undersigned counsel, hereby submits this Sentencing Memorandum discussing factors this Court should consider before imposing sentence.

Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: In determining whether and to what extent imprisonment is appropriate based on the § 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.  In this particular case and with this particular Defendant, a sentence of no more than three years would be "sufficient, but not greater than necessary" to comply with the statutory and policy goals of sentencing, including promoting

respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by Mr. Brooke.[1]

## I. Background-Mr. Brandon Brooke

Prior to this case, Brandon Brooke was never charged with violation of any law of this State or country. He now stands before this Court a convicted felon, having admitted the crime with which he was charged in the Superseding Indictment.

However, most persons charged with firearms offenses who appear before this Court used the firearm to commit some other crime or were previously convicted felons who should have never possessed a firearm at all. And there is often some implicit threat of violence and other wrongdoing associated with people who commit federal crimes involving firearms.

But that is not Mr. Brooke. There is much more this Court should consider before it determines a sentence that would be sufficient to satisfy the purposes of sentencing.

Mr. Brooke left school in sixth grade and began working. He did not start stealing. He did not start selling or taking drugs. He did not turn to crime. Instead,

---

[1] *See* U.S.S.G. § 5B1.1 Introductory Commentary.

he started doing yard work, an occupation he continues to pursue. He is a simple man who cleans yards to earn a meager living.

Mr. Brooke is 30 years old. Although recently married, he still resides with his parents. His first child is due in a few months.

Mr. Brooke does not golf. He does not fish. He does not play any sports. He does not even hunt.

His sole hobby, one he will never pursue again, was shooting firearms. He was in a club with individuals who are fascinated by firearms. When he had money above that which he needed to pay for the necessities of life, Mr. Brooke did not buy drugs or alcohol. Instead, he used his "extra" money to buy firearms and ammunition.

Because he could not afford multiple firearms, Mr. Brooke would typically buy a firearm, shoot it for a period of two to three months, and then resell it. He sold some to friends who bought guns from him, but he typically advertised publicly, openly, in a gun magazine. For years, he resold the used firearms to finance his hobby, which is permissible under the statute.

But in the last three years, Mr. Brooke crossed the line. On some occasions, he bought an extra firearm for the purpose of reselling it, so that he would make a

little extra money. That is where he crossed the line between legal and illegal conduct.

Mr. Brooke did not make huge sums of money. It is not how he supported himself. He would typically sell the firearm for the same amount as he bought it (depending on the level of prior use) or for no more than $100 in excess of the purchase price. His typical "profit," *i.e.*, the amount by which the sales price exceeded the purchase price, was $50.

Mr. Brooke advertised publicly in a gun magazine. He did not hide or try to conceal his activities. He had two or three persons who purchased from him on more than one occasion. But he had no relationship with them. He did not know them but believed they were fellow gun enthusiasts.

Mr. Brooke admits he violated the law, but he did not know his conduct violated the law when the sales were made. In fact, in an effort to comply with the law, Mr. Brooke would not sell the firearm unless the buyer first presented him with a valid Florida driver's license.

At some point prior to his arrest, the ATF gave Mr. Brooke a warning that he could not buy guns for other people. The PSR implies that Mr. Brooke arrogantly ignored that warning. He did not. He researched the issue and concluded he was

not violating the law because he was not acting as a straw man for others buying guns.

Significantly, Mr. Brooke never identified a purchaser of a gun before he bought the firearm. He did not go out and buy guns for people as their "strawman." And he is not charged with doing so. In fact, the government dismissed the "straw man" charges it originally filed against Mr. Brooke. He is charged with selling firearms without a license (for profit and not just for his hobby), which he admits he did.

The government tries to portray Mr. Brooke's continued sale of firearms after the ATF warning as some sort of arrogance or disregard of the law. However, that action actually confirms the following truth: Mr. Brooke did not believe he was violating the law. Therefore, he continued to sell the firearms he had bought just as he had, openly and without concealment of any sort. He thought he could do so as part of his hobby. He did not realize that he had crossed the line when he sold the firearms for more than he had paid.

The statute under which Mr. Brooke was charged provides an exception for, *inter alia*, people who sell firearms as part of their hobby. *See* 18 U.S.C. § 921 (21)(C). More particularly, the test for determining whether someone is engaged in the business of selling firearms is whether he or she "devotes time, attention and

labor … to predominantly earn a profit through the repetitive purchase and resale of firearms….." *See* 18 U.S.C. § 921 (21)(C). However, the statute goes on to provide that the term to "predominantly earn a profit" does not include "a person who makes occasional sales, exchanges or purchases of firearms for the enhancement of a personal collection or for a hobby…."

The foregoing statutory language is the result of a relatively recent amendment. What exactly "predominantly earn a profit" means has not been fully tested or clarified by the courts. Mr. Brooke admits he bought and resold 21 firearms in a three-year period for more than he paid for them. The volume of his activities would seem to take it outside of "hobby" purposes, which Mr. Brooke admits.

But it was a close call for his counsel. Although Mr. Brooke made a profit on some of the sales, they were all related to in some way to Mr. Brooke's hobby. He was not making a living or making exorbitant monies for the sales.

Usually, the defendants who stand before this Court facing firearms charges were involved in some other underlying offense. That is not the case with Mr. Brooke. His sole offense was selling firearms without a license. While some of those firearms may have been later connected to other crimes, Mr. Brooke had no knowledge of that fact and nothing to do with them. He thought he was selling to other firearms enthusiasts, like himself.

Mr. Brooke scores a level 13 on the sentencing guidelines chart, category 12. That guideline calls for a sentence of 12 to 18 months.

As further discussed below, any incarceration would be greater than necessary to satisfy the purposes of punishment in this case.

**II.    Sentencing Purposes/Factors**

In *Rita v. United States*, 551 U.S. 338 (2007), and *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court made it clear that the Sentencing Guidelines are a starting point for sentencing decisions, but are just one of several factors the courts should consider in fulfilling the statutory command to impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing. The sentencing courts should consider all of the factors under 18 U.S.C. § 3553(a) and then make an individualized assessment of the particular Defendant before it based on the facts presented. *Id*., at 2469. In *Pepper v. U.S*. 131 S.Ct. 1229, 1240 (2011), the Court emphasized the need for individualized sentencing, reiterating "the principle that 'the punishment should fit the offender and not merely the crime.'" (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see also Miller v.*

*Alabama*, 132 S.Ct. 2455 (2012) ("[P]unishment for crime should be graduated and proportioned to both the offender and the offense.").[2]

In determining the minimally sufficient sentence, § 3553(a) directs sentencing courts to several statutory enumerated factors, all of which are addressed below.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Offender**

   **(a) Nature and Circumstances of the Offense**

Mr. Brooke was charged in a one-count Indictment with unlawful dealing of firearms in violation of 18 U.S.C. § 922(a)(1)(A). This is a crime that encompasses a wide range of culpability. The extreme range would include persons who deliberately sell firearms to members of organized crime or drug cartels. At the

---

[2] *See also U.S. v. Cook*, 938 F.2d 149, 152 (9th Cir. 1991) ("The Guidelines are not a straightjacket for district judges."); *U.S. v. Dominguez*, 296 F.3d 192, 196 n. 7 (3rd Cir. 2002) (quoting *U.S. v. Johnson*, 964 F.2d 124, 125 (2d Cir.1992)("The Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom."); *U.S. v. Blarek II*, 7 F.Supp. 2d 192, 211 (EDNY 1998) ("To impose the harsh sentence suggested by Probation and the government under the Guidelines without appropriate downward departures would amount to an act of needless cruelty given the nature of the crimes committed and the personal circumstances of these defendants"). Remember also that "[i]f the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm." *U.S. v. Meyers*, 353 F.Supp. 2d 1026, 1027 (S.D. Iowa 2005).

lower end, the statute captures people like Mr. Brooke who do not intend to foster further criminal activity.

The undersigned hastens to say that this is an important law and all of the conduct it captures is serious. And, while Mr. Brooke did not intend to foster further criminal conduct, it appears he may have unwittingly done so. Thus, the undersigned does not intend to understate the seriousness of the crime that Mr. Brooke admits committing, but still submits that the scale of conduct which the statute captures and what Mr. Brooke actually did and intended to do are something the Court should consider. Put another way, it would be far more serious if Mr. Brooke sold guns to someone he knew was going to use them to commit another crime. In fact, Mr. Brooke believed he was selling firearms to other gun enthusiasts and for at least most of the transactions that belief appears to have been well-founded.

### (b) History and Characteristics of Mr. Brooke

Mr. Brooke is a first-time offender. He has never been convicted or even charged with any crime before this case. He has been a law-abiding citizen who did not believe he was doing anything to violate the law or adversely affect the lives of those around him. He has recently married, is expecting his first child, cares for and helps care for his parents, and is and will be a productive member of society.

As evidenced by his plea of guilty, Mr. Brooke takes full responsibility for his actions.

### 2. The Need for the Sentence Imposed To Promote Certain Statutory Objectives

The purpose of the statute under which Mr. Brooke was convicted seems clearly designed to lessen or stop the number of firearms that are sold by those without a license. Mr. Brooke will never again sell a firearm. The statute has been satisfied as to him and would clearly deter those who know him and know what he has been through and will go through as a result of the crime he admits committing. A sentence of anything more than probation would not significantly further that the statutory objectives.

### (a) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense

A probationary sentence would provide just punishment for the offense and would promote respect for the law.

Based on his felony conviction in this case, Mr. Brooke will face an overwhelming number of collateral consequences. A relatively recent congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*,

(Sept. 2017), available at http://www.gao.gov/products/GAO-17-691.pdf. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*. Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such an impact at sentencing. *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073 at *1 (E.D.N.Y May 24, 2016)(Block, J.).

Among other things, Mr. Brooke will never sell or even possess a firearm again. He has lost his rights to do so. His sole hobby was shooting, a hobby enjoyed by millions of Americans. He will never be able to participate in that hobby again. He entirely forfeited his rights under the Second Amendment to the United States Constitution, rights otherwise guaranteed to all Americans. That is a very significant collateral effect of his punishment that reflects the seriousness of the offense and satisfies this sentencing factor.

### (b) to afford adequate deterrence to criminal conduct

Mr. Brooke will obviously be deterred from further criminal conduct by the imposition of probation. He can never own or sell a firearm again. And those who know Mr. Brooke or hear of his case and know that he has lost his Second Amendment rights will also be deterred from engaging in similar conduct. A sentence of incarceration would not do anything to further the aim of deterrence.

A prison sentence will accomplish the § 3553 factor of deterrence. An analysis of both general and specific deterrence proves that point.

*1. General Deterrence*

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . .. [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder *et al.*, *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at https://www.brennancenter.org/our-work/research-reports/what-caused-crime-decline*.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013). The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l

Inst. of Justice, *Five Things About Deterrence* (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id.*; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

    2.    *Specific Deterrence*

The factor of specific deterrence also supports Mr. Brooke's request for a variance. The first part of this section focuses on studies establishing that incarceration has no effect on recidivism. In addition to this general empirical evidence, the second part asserts that Mr. Brooke's history and characteristics prove that he will never commit another crime.

    a.    *The relationship between incarceration and recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). As the following discussion describes, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do*

*Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

The 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. *See also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017)(concluding that research shows a "weak relationship between incarceration and crime reduction, and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration").[3] Instead, a longer prison sentence may actually lead to a greater risk of recidivism. There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders - leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Public Policy 589 (2007).

---

[3] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level. . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. *See id*. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887)("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Finally, the 2016 study concludes that community correction programs are more effective than incarceration in reducing recidivism. *See* R. S. Frase et al, *Criminal History Enhancements Sourcebook* (2015)(discussing studies establishing the crime that "custody is associated with higher rates of re-offending than community sentences"). Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections. Offenders whose crime of conviction was nonviolent recidivated at half the rate of violent offenders, and when nonviolent

15

offenders did recidivate, the new offense was less likely to be violent. *See* USSC, *Recidivism Among Federal Violent Offenders,* at 3 (2019).

### (c) to protect the public from further crimes of the defendant

Mr. Booke is a first time and only-time offender. There is no threat that he will again make the same mistake for which he now atones.

### (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Mr. Brooke has a high school education and is able to obtain gainful employment. Based on his education, employment history and overall health, Mr. Brooke would not benefit from any educational or vocational programs in the Federal Bureau of Prisons (BOP). Also, there is no indication that Mr. Brooke would benefit from any type of substance abuse treatment.

### 3.   The Kinds of Sentences Available

The maximum term of imprisonment for Mr. Brooke is five years for count 1. 18 U.S.C. § 922(a)(1)(A). Mr. Brooke is also statutorily eligible for not less than one nor more than five years' probation. 18 U.S.C. § 3561(c)(1). The Court has broad discretion to fashion an appropriate sentence, but anything other than probation would be greater than necessary.

### 4. The Sentencing Range Established by the Sentencing Commission

According to the Probation Office's calculations, based upon a total offense level of 13 and a criminal history category of II, the advisory sentencing range is 12-18 months. However, Mr. Brooke respectfully suggests that any sentence within this range would be "greater than necessary" to serve the purposes of sentencing in this case. The sterile arithmetic of the computation of the applicable guideline range plainly does not account for mitigating factors regarding Mr. Brooke's offense and personal circumstances, his acceptance of responsibility, and his cooperation with law enforcement. He requests that this Honorable Court consider sentencing him to a probationary period of (3) three years. A three-year probationary period would serve all of the goals of punishment established by the Sentencing Reform Act.

### III. Conclusion

Even when a traditional departure is not justified, a non-guideline sentence can be appropriate "because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita*, 551 U.S. 338, 351 (2007); *see also Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes

17

magnify, the crime and the punishment to ensue.") Decisions in *Booker, Kimbrough, Rita, Gall, Nelson* and *Spears*, and the command of 18 U.S.C. § 3553 to impose a sentence that is "sufficient, but not greater than necessary," have given sentencing courts greater latitude to impose a sentence that fits the crime and the person before the court. Mr. Brooke respectfully requests that this Court exercise that discretion in imposing a three-year probationary period.

/s/Charles M. Greene
Charles M. Greene
Florida Bar No. 938963
Charles M. Greene, P.A.
55 East Pine Street
Orlando, Florida 32801
Telephone (407) 648-1700
Facsimile (407) 648-0071
E-Mail: cmg@cmgpa.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 9, 2024, the foregoing document was electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Terry Livanos, Assistant United States Attorney, 400 West Washington Street, Suite 3100, Orlando, Florida 32801.

/s/Charles M. Greene
Charles M. Greene